1

2

3

4

5

6

7

# UNITED STATES DISTRICT COURT

8

### EASTERN DISTRICT OF CALIFORNIA

9

10  ANTHONY JONES,                          Case No. 1:14-cv-01752-LJO-SAB-HC

11              Petitioner,                 FINDINGS AND RECOMMENDATION
                                            RECOMMENDING DENIAL OF PETITION
12      v.                                  FOR WRIT OF HABEAS CORPUS

13  DAVID DAVIES,

14              Respondent.

15

16          Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

17  pursuant to 28 U.S.C. § 2254.

18                                          **I.**

19                                     **BACKGROUND**

20          Petitioner challenges his 2010 conviction in Kern County Superior Court for first-degree

21  murder. The jury also found true a gang-firearm enhancement. Petitioner was sentenced to life in

22  prison without the possibility of parole.

23          Petitioner filed a timely appeal. (LD[1] 4). On May 18, 2012, the California Court of

24  Appeal, Fifth Appellate District affirmed the judgment, but vacated Petitioner's sentence and

25  remanded for resentencing. People v. Perkins, No. F060071, 2012 WL 1774826 (Cal. Ct. App.

26  May 18, 2012). Petitioner filed a petition for review in the California Supreme Court. (LD 8). On

27  August 8, 2012, the California Supreme Court denied Petitioner's petition for review. (LD 9).

28  _____
[1] "LD" refers to the documents lodged by Respondent on April 15, 2015. (ECF No. 15).

On October 31, 2012, Petitioner was resentenced by the trial court to a term of twenty-five years to life for his first-degree murder conviction and a consecutive term of twenty-five years to life for the gang-firearm enhancement.

Petitioner filed a timely appeal. (LD 13). On May 28, 2014, the California Court of Appeal, Fifth Appellate District affirmed the judgment. People v. Jones, No. F066161, 2014 WL 2207332 (Cal. Ct. App. May 28, 2014). Petitioner filed a petition for review in the California Supreme Court, which was denied without prejudice on August 13, 2014. (LDs 17, 18).

## II.

## STATEMENT OF FACTS

The record from the California Court of Appeal is as follows: [2]

*I. The Prosecution*

*A. The Shooting*

Around 9:15 p.m. on February 13, 2007, gunshots were heard by residents of a house on Snapdragon Lane in Bakersfield. The residents described hearing two sets of gunshots, comprised of one or two gunshots followed by a brief pause and then a number of gunshots in quick succession. When the residents looked through their kitchen window, they saw the victim, later identified as Deondre McGruder, lying in the front yard. McGruder, who sustained multiple gunshot wounds, died from massive bleeding caused by a gunshot wound to the chest.

A criminalist examined eight spent cartridge casings found at the scene and expressed the opinion that all eight were fired from the same firearm. The firearm was a .40–caliber Glock semiautomatic pistol, either the Glock Model 22 or the Glock Model 23. Police investigators also recovered one live round from the scene, but it was of a different caliber than that of the eight spent cartridge casings. Investigators found a piece of copper jacketing and a copper jacketed projectile at the scene, and another projectile was collected from the autopsy.

*B. Torino Jackson (Accomplice Testimony)*

Torino Jackson attributed the shooting to appellants. Jackson testified that sometime during the afternoon on February 13, 2007, Perkins came to his house. Jones joined them later and they all hung out together on Jackson's front porch.

After it got dark, Jackson's friend, Nyesha Hendrix, came to the house and drove Jackson and appellants back to her apartment. Eventually, the three men left the apartment and got into Hendrix's red, two-door Ford Escort and started driving

---

[2] The California Court of Appeal, Fifth Appellate District's summary of the facts in its May 18, 2012 opinion is presumed correct. 28 U.S.C. § 2254(d)(2), (e)(1). Petitioner does not present clear and convincing evidence to the contrary; thus, the Court adopts the factual recitations set forth by the state appellate court. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009) ("We rely on the state appellate court's decision for our summary of the facts of the crime.").

around. Perkins was the driver, Jones sat in the front passenger's seat, and Jackson sat in the backseat. While they were driving around, Jackson was busy texting on his cell phone.

Perkins eventually stopped the car on a residential street and got out with Jones, while Jackson stayed in the car. Jackson saw appellants walk towards a house close to where they parked. A few minutes later, appellants returned to the car and they started driving again.

Soon after they started driving again, Jackson saw McGruder walking down the street. McGruder appeared to be talking to someone in another car. Jackson testified that, as they drove by McGruder, Perkins asked him, "Watts up?" McGruder replied, "All day, every day." In a prior police interview, Jackson said McGruder addressed them first, asking "Watts up?" Perkins responded by asking the same question. McGruder then said "[a]ll day, every day" and yelled "South" as appellants' car passed by him.

Jackson testified that after this verbal exchange with McGruder, Perkins drove into a cul-de-sac and turned around. Perkins then stopped the car near where McGruder was walking and turned off the engine and lights on the car. Appellants both got out of the car, while Jackson remained in the back seat. Jones donned a ski mask, pulling it down so it covered his whole face.

Jackson saw appellants start walking towards McGruder. He was not paying close attention, however, because he was still on his phone. Suddenly, Jackson heard gunshots and ducked down. He then peeked out and saw Perkins pointing a gun at McGruder. Jackson heard two sets of gunshots that night.

When the gunshots ended, appellants returned to the car. As they were driving away, Jackson observed a silver gun on Jones's lap. On direct examination, Jackson testified that there was no conversation during the drive back to Hendrix's apartment, which took five to seven minutes. However, on cross-examination, Jackson testified that he remembered Jones saying that his gun had jammed.

Jackson acknowledged that he knew a person named James Beale, who had been shot and killed in February 2007. Jackson claimed he could not recall appellants discussing Beale on the drive back to Hendrix's apartment. He only recalled that they had discussed the subject earlier that day at his house, talking about how "messed up" it was that someone had killed Beale. However, during a prior police interview, Jackson said the shooting "probably was a retaliation," and reported that, during the drive back to Hendrix's apartment after the shooting, appellants were talking about what "a cool person" Beale had been and how they had known him for a long time.

Jackson testified that when they got back to Hendrix's apartment, Hendrix opened the door and appellants went inside. Jackson claimed he stayed outside and called his sister. Eventually, two girls he knew from high school arrived at the apartment complex and gave him and appellants a ride home.

Jackson testified that the morning after the shooting, Hendrix texted him and then took him to breakfast at Denny's. After breakfast, Hendrix returned Perkins's gun to Jackson. Jackson hid the gun inside his house until Perkins came and got it from him on February 15, 2007.

*C. Nyesha Hendrix*

Hendrix testified that on February 13, 2007, she drove to Jackson's house around 8:00 p.m. She then drove Jackson and appellants back to her apartment, so she could get her wallet. When she was in her bedroom getting her wallet, Perkins came in and asked her if he could borrow her car. Hendrix was reluctant at first because Perkins had borrowed her car in the past and returned it late. She finally agreed to let him borrow the car after he promised to return it by 9:40 p.m. After Hendrix gave Perkins the keys to her car, he left the apartment together with Jones and Jackson. Hendrix did not know where they were going.

Sometime after she had gone to bed, Hendrix got a call from Jackson, asking her to open the front door to her apartment. Hendrix looked at her clock, which showed it was 9:42 p.m. Hendrix got out of bed and opened the front door. Appellants and Jackson were standing there. According to Hendrix, all three men, including Jackson, came into the apartment and Hendrix went back into her bedroom.

After the three men came into Hendrix's apartment, Jackson went back into the bathroom in Hendrix's bedroom, while Perkins and Jones stayed in the living room. Perkins used Hendrix's house phone to call Tasha Lelfore, whom Hendrix knew from school.

When Jackson came out of the bathroom, he sat on the edge of Hendrix's bed but did not say anything about the shooting. Eventually, Jackson left and Hendrix stayed in her bedroom. When she was in her bedroom, one of the three men told her to come lock the front door because they were leaving. Hendrix got up, locked the door, and then went back to bed.

Hendrix woke up early the next morning and started cleaning her apartment. While she was cleaning, she found a black gun and a ski mask under the couch. Hendrix recalled that the gun had "Glock .40" printed on it. She had never seen a gun before in her house.

Hendrix placed the gun and ski mask in a backpack. She then called Jackson and asked him why there was a gun in her house. Jackson told her that Perkins had left it there.

After putting the backpack in her car, Hendrix drove to Jackson's house. Jackson came outside, took the gun and ski mask from Hendrix, and carried the items back into his house, hiding the gun under his shirt. Jackson then returned to Hendrix's car and they went to Denny's.

Later that day, Hendrix took her car to her grandmother's house, washed it, and left it there with a tarp over it.

In the past, Hendrix had heard Perkins say he was from Grape Street which she took to mean "he was involved with the gang Grape Street."

On cross-examination, Hendrix testified it was a total surprise to her to find the gun under the couch. She did not recall any of the three men saying anything about leaving a gun when they left her apartment. However, in a prior police interview, Hendrix reported that, as Perkins was leaving her apartment, he asked her to take his gun to his uncle's house. Hendrix told police she did not think anything of it at the time because she was half asleep. But the next morning when

she was picking things up, she saw something black sticking up from under the couch, grabbed it, and realized it was the gun Perkins had mentioned.

Hendrix also testified on cross-examination that, when she went to Denny's with Jackson the day after the shooting, Jackson told her that Jones "shot the guy twice and the gun jammed." Jackson also said something to the effect that McGruder got what he deserved because he killed Beale. Hendrix specifically recalled Jackson saying, "That's what he get because he shouldn't have killed James like that."

### D. Tasha and Tasia Lelfore (Witnesses of Events After Shooting)

Sisters Tasha and Tasia Lelfore confirmed that on the evening of February 13, 2007, Perkins called to ask for a ride, and that they drove to apartments near the Wilson library and saw Jackson and appellants standing outside. Because there was not enough room in the car for all three men, Tasia dropped Tasha off and then returned to give Jackson and appellants a ride home. At trial, Tasia estimated that she started dropping the three men off at home around 9:00 p.m. However, she previously told a police detective it was closer to 10:00 p.m. when she started dropping them off.

Tasha testified that Perkins later called her at work and told her that she did not pick him up on February 13. She got the impression that he was trying to get her to testify that she picked him up on some other date. Tasha was certain that she and her sister picked appellants up at the apartments on February 13, 2007, because it was her friend's birthday and they were having a party that night. When Perkins called Tasha, he also asked for Tasia's phone number, which Tasha gave to him.

A recording of the call Perkins made to Tasha, which Perkins placed from jail, was played to the jury and admitted into evidence against Perkins only. The recording reflects that Perkins also tried to call Tasia, but his call went to her voicemail.

### E. Travon Stewart, Leann Newman, and Paul Evans (Witnesses of Events Prior to Shooting)

On the night of February 13, 2007, two witnesses, Travon Stewart and Leann Newman, saw McGruder walking in a residential street near where the shooting occurred. They also both saw a red car in the vicinity. Stewart later identified Hendrix's red Ford Escort to police as the car he saw that night.

Newman specifically testified that, although they were no longer together, she had lived with McGruder for seven years and had a young child with him. Newman explained that when she saw McGruder on the night of the shooting, she was on her way to drop off their child at McGruder's mother's house to visit his father. Stewart was driving the car Newman and the child were in when she saw McGruder.

When Newman first saw McGruder, he was walking in the direction of his mother's house. The street he was walking on was near Snapdragon Lane and the street where a Foods Co. store was located. As they drove past McGruder, he looked at the car and gestured towards Newman with his hands. They kept driving and dropped the child off at McGruder's mother's house.

After dropping the child off, Newman saw McGruder again. He was still walking towards his mother's house and appeared to have just crossed back from talking to someone in a red car.

Stewart testified that when they first drove past McGruder, he appeared to be trying to flag down their car. Stewart kept driving and did not see McGruder again after they dropped off the child. As they were driving away from the house, Stewart saw Hendrix's red Ford Escort parked by a curb. Stewart saw one person in the car, sitting in the driver's seat.

Paul Evans testified that in February 2007, he lived near the Foods Co. in the neighborhood where the shooting occurred. Evans knew appellants and Jackson. Evans described Jackson as a close family friend. Evans was also friends with Jones, and considered himself to be a closer friend to Jones than to Jackson. Perkins, on the other hand, was "[n]ot a close friend but associate."

After the shooting, police officers came to Evans' house and informed him that Jones had been taken into custody on February 15, 2007. Evans told the police that Jones had stopped by his house a couple of days before Jones was taken into custody. Jones had stopped by twice, once in the afternoon and once in the evening.

Evans initially testified that when Jones came over to his house in the evening, it was sometime between 7:00 p.m. and 7:30 p.m. However, he later acknowledged telling police that Jones came over around 8:00 p.m. He also told police Jones could not have come over around 9:00 p.m. or 9:30 p.m. because Evans had left his house around that time.

In addition, Evans told police that, after Jones left his house that night, he too left and came back later. When Evans came back to his house, he started ironing his clothes for school. While he was ironing his clothes, a girl he knew called and told him that somebody had just gotten shot and asked him if he was okay.

Evans further testified that he saw Jackson at a McDonald's restaurant on February 21, 2007, and that Jackson asked him if he knew anyone who wanted to buy a Glock gun. Evans did not actually see the gun but could see the outline of a gun under Jackson's T-shirt. Jackson told Evans the gun "had a body on it."

The first time Evans ever told anyone about his conversation with Jackson about the gun was to a defense investigator in January 2010; Evans did not report the conversation to police investigators who questioned him about the shooting in 2007. The defense investigator, Victor Lostaunau, testified that Evans did not mention seeing the outline of a gun under Jackson's T-shirt but instead reported that he did not see the gun Jackson told him about.

*F. Gang Evidence*

The parties stipulated that the Eastside Crips is a criminal street gang in Kern County, as the term "criminal street gang" is defined under section 186.22. Bakersfield Police Officer Kyle Ursery testified as a gang expert and opined that appellants were active members of the Eastside Crips and that Jackson was an affiliate or associate of the gang. Ursery further opined that McGruder was affiliated with the Country Boy Crips, and testified that a longstanding rivalry existed between the East Side Crips and the Country Boy Crips. Presented with a hypothetical shooting based on the facts of this case, Ursery expressed the opinion

"[t]hat it would, in fact, be in benefit of, at the direction of, and in furtherance of that particular gang."

Bakersfield Police Sergeant Greg Jehle also testified as a gang expert and opined that Evans was an active member of the Eastside Crips gang. Jehle was of the opinion that, if an active member of the Eastside Crips criminal street gang testified in a case involving two defendants that were alleged members of the same gang, the testimony would benefit both the gang and the member that testified.

*G. Evidence Against Perkins Only (Dissuading a Witness Charge)*

Hendrix testified that she was arrested and charged with being an accessory to murder. Following her arraignment, she was transported in the same elevator with Perkins. She heard Perkins say she needed to be scared for her family and that "his boy T" was coming after them. Hendrix knew he was referring to a person named Terry. The elevator incident occurred shortly after Hendrix's father had called the police to report that someone was calling and making threats against Hendrix's family. Hendrix considered Perkins's comments in the elevator to be a threat and she felt scared.

Valentina Branda, another inmate who was in the elevator with Hendrix and Perkins, testified Perkins leaned forward between Hendrix and Branda and said two times, "Don't trip. The boys are coming." Hendrix started crying, which led Branda to believe Hendrix was scared.

Branda further testified that she heard Perkins make the same comment ("The boys are coming") under his breath in the courtroom during the arraignment preceding the elevator ride.

*II. Perkins's Defense*

The defense presented evidence to show Jackson was the one who placed a threatening phone call received by Hendrix's father, Keith Hollins, on February 24, 2007. Specifically, Hollins testified the phone rang around 11:00 p.m., and a male caller asked "is Nyesha there." Hollins asked who was speaking. The caller replied, "Reno" (Jackson's moniker). Hollins told him it was late and that they did not get calls that late. The caller replied that he knew she was there and that she "snitched" on his "homie." Hollins told the caller he did not know what he was referring to. The caller replied, "yeah, you know what's going on," and "she owe me some money."

Hollins further testified: "[A]fter he said, yeah, she is there, he said, yeah, and we are going to have to pull one. And I can hear voices in the background on the phone saying yeah, yeah, something like that. Then he proceeded to tell me exactly where we lived." When Hollins asked the caller how he knew where he lived, the caller said to look out the window. Hollins did not look outside. After hanging up the phone, Hollins directed his family members to lie down on the floor and dialed 911.

Bakersfield Police Officer Scott Drewry responded to Hollins' residence 15 to 20 minutes later. Drewry testified that Hollins told him that Jackson, whose voice he recognized, had called and requested to speak with Hendrix. When Hollins refused, Jackson began to threaten Hollins, saying he was going to shoot Hendrix for speaking with the police regarding their investigation and that he was going to

1   kill all the family members.

2   When speaking with Drewry, Hollins referred to Jackson by his first name
    (Torino) and said he knew Jackson and that Jackson had come to his residence on
3   a number of occasions with Hendrix. Hollins did not mention hearing other voices
    in the background or Jackson saying anything about "homies" during the phone
4   call.

5   Drewry also spoke with Hendrix, who told him that she thought Jackson was
    involved in the murder on Snapdragon Lane and believed that Jackson thought
6   she was speaking with police regarding their investigation of the murder. Hollins
    and Hendrix both sounded like they were being truthful.
7
    The defense also presented evidence that Hendrix initially reported to police that
8   Jackson borrowed her car on the night of the shooting. Bakersfield Police
    Detective Dennis West testified he interviewed Hendrix on February 25, 2007.
9   During the interview, she said she picked Jackson up at his house and drove him
    back to her apartment. She also said she loaned her car to Jackson. She said she
10  gave him the keys and he left driving the car. Initially, she said Jackson borrowed
    her car around 9:20 p.m. (the reporting time of the Snapdragon homicide was
11  around 9:24 p.m.). However, in a later interview, Hendrix said he actually
    borrowed her car around 9:00 p.m., and she had lied in her first interview because
12  she was scared.

13  West also interviewed Jackson on February 25, 2007. Jackson initially reported
    that Hendrix stopped by his house but claimed he did not leave with her and was
14  at his house the whole day. Later, Jackson admitted he went to Hendrix's
    apartment and said he went to get money for shoes. Jackson reported that when he
15  went inside her apartment, Perkins came out of the bedroom and then he and
    Perkins both left.
16
    Jackson initially denied taking possession of a gun from Hendrix. Eventually, he
17  admitted he received a gun from Hendrix and put it under his couch.

18  West also testified that the distance between Hendrix's apartment complex, which
    was located on Freemont Street off of Wilson and South H Streets, and the
19  address on Snapdragon Lane where the shooting occurred, was about a mile and a
    half, and was a three to 15 minute drive, depending on traffic. There was a
20  mixture of residential and commercial areas between Hendrix's residence and the
    Snapdragon Lane location. The distance between Jackson's residence on Monitor
21  Street and the Snapdragon Lane location was roughly two miles.

22  Perkins, 2012 WL 1774826, at *2-7 (footnotes omitted).

23                                      III.

24                                 DISCUSSION

25  A.      Standard of Review for a Writ of Habeas Corpus

26          Relief by way of a petition for writ of habeas corpus extends to a person in custody

27  pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

28  or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

                                          8

529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises out of Kern County Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Harrington v. Richter, 562 U.S. 86, 97-98 (2011); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id. In addition, the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2009) (quoting Wright v.

1  Van Patten, 552 U.S. 120, 125 (2008)); Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v.

2  Musladin, 549 U.S. 70 (2006). If no clearly established Federal law exists, the inquiry is at an

3  end and the Court must defer to the state court's decision. Carey, 549 U.S. 70; Wright, 552 U.S.

4  at 126; Moses, 555 F.3d at 760.

5       If the Court determines there is governing clearly established Federal law, the Court must

6  then consider whether the state court's decision was "contrary to, or involved an unreasonable

7  application of, [the] clearly established Federal law." Lockyer, 538 U.S. at 72 (quoting 28 U.S.C.

8  § 2254(d)(1)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the

9  state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question

10 of law or if the state court decides a case differently than [the] Court has on a set of materially

11 indistinguishable facts." Williams, 529 U.S. at 412-13; see also Lockyer, 538 U.S. at 72. "The

12 word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character

13 or nature,' or 'mutually opposed.'" Williams, 529 U.S. at 405 (quoting Webster's Third New

14 International Dictionary 495 (1976)). "A state-court decision will certainly be contrary to

15 [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the

16 governing law set forth in [Supreme Court] cases." Id. If the state court decision is "contrary to"

17 clearly established Supreme Court precedent, the state decision is reviewed under the pre-

18 AEDPA de novo standard. Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc).

19      "Under the 'reasonable application clause,' a federal habeas court may grant the writ if

20 the state court identifies the correct governing legal principle from [the] Court's decisions but

21 unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

22 "[A] federal court may not issue the writ simply because the court concludes in its independent

23 judgment that the relevant state court decision applied clearly established federal law erroneously

24 or incorrectly. Rather, that application must also be unreasonable." Id. at 411; see also Lockyer,

25 538 U.S. at 75-76. The writ may issue only "where there is no possibility fair minded jurists

26 could disagree that the state court's decision conflicts with [the Supreme Court's] precedents."

27 Richter, 562 U.S. at 102. In other words, so long as fair minded jurists could disagree on the

28 correctness of the state court's decision, the decision cannot be considered unreasonable. Id. If

1    the Court determines that the state court decision is objectively unreasonable, and the error is not

2    structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious

3    effect on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

4          The AEDPA requires considerable deference to the state courts. "Factual determinations

5    by state courts are presumed correct absent clear and convincing evidence to the contrary."

6    Miller-El v. Cockrell, 537 U.S. 322, 340 (2003) (citing 28 U.S.C. § 2254(e)(1)). The court looks

7    to the last reasoned state court decision as the basis for the state court judgment. Stanley v.

8    Cullen, 633 F.3d 852, 859 (9th Cir. 2011); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir.

9    2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning

10   from a previous state court decision, this court may consider both decisions to ascertain the

11   reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en

12   banc). "When a federal claim has been presented to a state court and the state court has denied

13   relief, it may be presumed that the state court adjudicated the claim on the merits in the absence

14   of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. This

15   presumption may be overcome by a showing "there is reason to think some other explanation for

16   the state court's decision is more likely." Id. at 99-100 (citing Ylst v. Nunnemaker, 501 U.S. 797,

17   803 (1991)).

18         Where the state court reaches a decision on the merits but provides no reasoning to

19   support its conclusion, a federal habeas court independently reviews the record to determine

20   whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v.

21   Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo

22   review of the constitutional issue, but rather, the only method by which we can determine

23   whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853. While

24   the federal court cannot analyze just what the state court did when it issued a summary denial,

25   the federal court must review the state court record to determine whether there was any

26   "reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98. This court "must

27   determine what arguments or theories ... could have supported, the state court's decision; and

28   then it must ask whether it is possible fairminded jurists could disagree that those arguments or

1    theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Id. at 102.

2    **B. Petitioner's Claims**

3    1.  Jury Coercion Related to Jury's Claim of Impasse

4    Petitioner's first and second claims are related to the jury's claim of impasse. In his first

5    claim for relief, Petitioner argues that the court coerced the jury into reaching a verdict, because

6    after the jury told the court that it was at an eleven-to-one impasse, the court ordered the jury to

7    continue its deliberations. (ECF No. 1 at 5).[3] In his second claim for relief, Petitioner argues that

8    his due process rights were violated when the trial court denied Petitioner's request to ascertain

9    whether the ill juror was the sole holdout juror and subject to any undue pressure after the jury

10   informed the court that it was at an eleven-to-one impasse. (Id. at 6).

11   These claims were presented on direct appeal to the California Court of Appeal, Fifth

12   Appellate District, which denied the claims in a reasoned decision. The California Supreme

13   Court summarily denied Petitioner's petition for review. As federal courts review the last

14   reasoned state court opinion, the Court will "look through" the California Supreme Court's

15   summary denial and examine the decision of the California Court of Appeal. Ylst v.

16   Nunnemaker, 501 U.S. 797, 806 (1991); Johnson v. Williams, 133 S. Ct. 1088, 1094 n.1 (2013).

17   The California Court of Appeal denied the claims as follows:

18   *B. The Trial Court Did Not Coerce the Jury Into Returning a Verdict*

19   *1.  Factual Background*

20   Appellants' jury trial commenced on January 28, 2010. There was a one-week
     break during the trial, where the jury was in recess, starting on the afternoon of
21   February 19, and ending on the morning of March 1, 2010. The jury began its
     deliberations on the afternoon of Monday, March 8, 2010. On the fourth day of
22   deliberations (Thursday, March 11, 2010), at 1:40 p.m., the jury sent a note
     advising the trial court: "We are at an impasse, 11 to 1 on all charges except
23   Count 3 on Perkins. On that charge we are all in agreement."

24   The trial court conferred with the attorneys and expressed its intention to instruct
     the jury pursuant to California Rules of Court, Rule 2.1036 (Rule 2.1036). The
25   defense attorneys objected to giving this instruction, arguing it would be coercive
     in light of the jury's revelation of an 11–to–1 vote. Jones's counsel also observed
26   that the jury's revelation violated "the instruction that the Court gave the jury ...
     that they were not to give numbers as to splits unless they were instructed by your
27

28   _____
     [3] Page numbers refer to the ECF page numbers stamped at the top of the page.

Honor." In lieu of the court's proposed instruction, Perkins's counsel requested that, "we just bring the jurors out; ask them if it's, in fact, 11 to one; if there is anything they feel the Court could do that would assist them in their deliberations. If the answer is no, ... inquire ... if they are, in fact, deadlocked ... and at that point just declare a mistrial."

After overruling the defense objections, the trial court made the following observations:

> "The Court, in [*People v. Young* (2007) 156 Cal.App.4th 1165 at page 1171], noted that the trial Court has the discretion to ascertain whether there is a reasonable probability a jury deadlock might be broken. When the Court is faced with a deadlocked jury, it must proceed carefully lest its actions be viewed as coercive. At the same time, when faced with questions from the jury, including that they have reached an impasse, a Court must do more than figuratively throw up its hands and tell the jury it cannot help. It must at least consider how it can best aid the jury.

> "This Court's aware of its duty not to make any remarks that could be viewed as coercive to the jurors. This Court is not going to urge the jurors to reach agreement. I am not going to give the jury any coercive instructions. I am not going to make any remarks that show the Court has a preference for a particular verdict. And I am going to proceed as indicated."

When the jury was brought back into the courtroom, the trial court read the jury's note and ascertained that it still reflected the status of its deliberations. The court then instructed the jury as follows:

> "THE COURT: All right. The first thing I will do—I'm not saying that you are in trouble. But I will point out again to you the instruction that has number 17.47, which you can look at when you go back in the jury room. And 17.47 directs the jurors not to disclose to anyone outside the jury, not even to me or any member of my staff, either orally or in writing, how you may be divided numerically in your balloting as at to any issue unless I specifically direct otherwise.

> "The purpose of that instruction is the Court has certain procedures that it follows if I am informed the jury is at an impasse. And we don't want the jurors sending out notes saying here's our breakdown on the following counts."

> "So from this point on, if there's an impasse just inform me of the impasse. And then I will follow the procedures that the trial Courts use in determining what information I need based on that.

> "Does that make sense?

> "THE FOREPERSON: Yes, it does. Yes, your Honor.

> "THE COURT: Thank you. [¶] ... [¶]

> "Here's what I'm going to do: The Rules of Court which guide trial Judges in conducting jury trials directs a Court that if a jury

reports that it has reached an impasse in its deliberations the trial Judge may, in the presence of counsel, advise the jury of its duty to decide the case, if you can do so, based on the evidence while keeping an open mind and talking about the evidence with each other. It also directs the Judge that the Judge should ask the jury if it has specific concerns which, if resolved, might assist the jury in reaching a verdict. [¶] ... [¶]

"And then the Judge is also to suggest further action that the Judge might offer that might assist the jury in reaching a verdict. And that possible further action includes the following: That could include further readback of testimony....

"Also, the Court could give additional instructions on the law. The Court could also clarify previous instructions already given to you on the law.....

"The Court could also permit the attorneys to make additional closing arguments.... [¶] ... [¶]

"So that's something I am also going to invite you to discuss among yourselves to see if there is anything that you would like the Court to do in that regard.

"And then the Court can obviously employ any combination of those different things I suggested. You are not limited to any one of them. You can ask for several different types of assistance.

"So let me also make it very clear that the Court is not in any way indicating that I have any preference as to any verdict that the jury may reach. I am not trying to coerce you in any way to reach a verdict. All I am trying to do is to say is there anything I can do to assist the jury in reaching a verdict. So that's the purpose of my comments to you. It's just to invite you to consider among yourselves if there is anything the Court can do to assist the jury in reaching a verdict, if you can do so. And this is not, in any way, meant to be coercive or to put undue pressure on anyone.

"So what I am going to ask you all 12 to do is to go back into the jury room. Discuss among yourselves the comments and suggestions that I have made. And then if there is something that the Court might do to assist the jury, send me a note. But don't give me any more breakdowns on the ballot. It may come to a point where I will ask for that, but you need to wait until I ask for that."

When the jury resumed its deliberations, Perkins's counsel made a motion for a mistrial, in which Jones's counsel joined, arguing the "net effect" of the trial court's instructions was to place "undue pressure on [the holdout] juror to change their vote to reach a verdict." The court denied the motion for mistrial, reasoning, in part: "So when [Rule 2.1036] says I advise the jury of its duty to decide the case, I add the words 'if you can do so' which I think makes it even more clear that the Court is not being coercive. If they can decide the case, that's fine. If they can't, that's fine too."

The same day, at 3:08 p.m., the jury sent the trial court a second note, which read as follows: "We are still at an impasse, and we have an ill juror who would like to be excused." The court then stated:

> "My proposed response to this note is to bring out all 12 jurors. Read the note in the presence of the jurors. Confirm with the foreperson that the note is correct. Then identify which juror he is referring to.

> "At that point, if it's confirmed that is a juror who is ill who would like to be excused, I will ask the other 11 jurors to go back into the jury room, instruct them not to deliberate while they are back there since they don't have 12 jurors, and then the Court intends to address the juror who may be ill and may want to be excused. I will address that subject just the way I would in any case. And then we will have a sidebar. And I will certainly consider offering counsel an opportunity to also examine the juror who may be identified as being ill."

Perkins's counsel objected to the court's proposed response and this colloquy ensued:

> "[DEFENSE COUNSEL]: My inquiry would be why are we addressing the ailment before we are addressing the impasse. Because if there's an impasse the ill juror is done. They are all done. They all go home. We don't need them anymore. So I think we are doing it in reverse order. Because we have a jury now, and they have sent out a note saying they are hung on two counts and got a verdict on a third count. And so it would make sense to deal with that before we have to deal with any illness issues.

> "THE COURT: Well, our jury is still deliberating. I have some reason to believe now that I may have a juror who is ill to the point that that juror is not able to perform their duties to deliberate. That obviously concerns me.

> "[DEFENSE COUNSEL]: ... But what I am saying is I don't think they are deliberating anymore. The note says they are at an impasse. And so that would tell me they are hopelessly deadlocked in light of everything that's happened up until now, including the Court's admonition to them a few minutes ago. So I think we have a hung jury. So I am asking the Court to declare a mistrial if, in fact, they are still at that impasse that the juror mentioned a little while ago.

> "The first note came out 1:40. It's now 3:30. And so, again, I don't think we need to address the issue of illness, and the affected juror there is going to be excused once a mistrial is taken and we take a verdict on the other count. So it wouldn't be more than 10 or 15 minutes and they will be out of here. Thank you.

> "THE COURT: I appreciate your input. I will note that I have asked the jurors to do further things in their deliberations, which would be to discuss among themselves how the Court might assist them in reaching a verdict if they can do so. If one of the 12 jurors is ill to the point that that juror is not able to meaningfully take part

in those discussions, then I have a duty to decide if I have 12 functioning jurors."

Defense counsel also requested that the trial court ask the ill juror whether that juror was also the holdout juror, asserting the question "would be very relevant ... because the two could be linked. I mean, the person is feeling so much pressure to get out of there it's making them sick because they are getting pressure from other jurors, and it's just a good excuse to leave." The court denied counsel's request.

When the jury returned to the courtroom, the trial court ascertained that Juror No. 2 was the juror who was the subject of the jury's note. The court then examined Juror No. 2, outside the presence of the other jurors, as follows:

> "Q. Ma'am, tell me what's going on with your state of condition or your physical or other condition.

> "A. My asthma.

> "Q. Your asthma?

> "A. Yeah. And I lost my voice too.

> "Q. Okay. When did you start suffering this adverse condition?

> "A. When I got sick the week before we went on break. And I was out for the whole week. My doctor took me off.

> "Q. All right.

> "A. And then I started getting better. But now it's starting to get worse again, plus I lost my voice too.

> "Q When did you first inform the foreperson in order for me to have this in the note. [¶] At some point you told the foreperson that you were feeling ill?

> "A. Yes. [¶] ... [¶]

> "Q. When did you first inform the foreperson that you were feeling ill?

> "A. After—well, when we got back, when we got back the second time.

> "Q. Was that this afternoon?

> "A. Yes.

> "Q. Well, the note that I am referring to now, the time is 3:08.[¶] Was it after the last time you came out into court and I instructed all of you to try to think of some different things the Court might do to assist you?

> "A. When I came back from lunch. And it's making me very tired too.

"Q. Okay. Now, has that been a problem until today? [¶] You have been deliberating since Monday afternoon?

"A. Correct.

"Q. Has your asthma condition been impairing your ability to function before today?

"A. Yes. It started getting worse again last night.

"Q. Okay. Now, if we were to recess now and come back tomorrow morning, do you think your condition would be improved?

"A. I can go see my doctor to see if she can give me something else.

"Q. Okay. Do you take medication for your condition?

"A. Yes.

"Q. And you don't have that medication available right now?

"A. I do have an inhaler. But as far as like antibiotics, they put me on steroids and everything. I have done all that, but nothing has helped. It seems like I am starting to have a relapse again.

"Q. When did you last see your doctor about this?

"A. The 26th, that Friday.

"Q. That would be February 26th?

"A. Yes.

"Q. Are you feeling some symptoms that you just feel you need to go home now?

"A. Yes, because I can hardly breathe.

"Q. Okay. And you don't have any medication or inhalers or things you can use now?

"A. I have an inhaler and everything. But I need some more medicine, basically.

"Q. If we recess now, do you think you would be able to get into see your doctor today?

"A. Yes.

"Q. Okay. Anything else you want to tell me about your condition, or is that pretty much it?

"A. Yes. It's just because I got sick."

After Juror No. 2 rejoined the other jurors in the jury room, Perkins's defense

17

counsel renewed his request that the trial court inquire of Juror No. 2 whether she was "in the minority or the majority. Because I do think the two could be tied together. It's not unheard of that somebody might become ill if they are being pressured to vote a certain way and want to get out of here." Counsel added further: "And I would like the record to reflect that Juror No. 2 is Black and is the only Black juror that we have here."

After listening to these and other arguments from the attorneys, the trial court ruled as follows:

> "... [W]hat I have a duty to do is first to safeguard the well-being of our jurors. I have a juror who just told me that she has a condition that has been with her some time, the asthma. She's been receiving medical care for it. And she is suffering some acute condition right now that's making it hard to breathe. And I am not going to put this juror in any further jeopardy or make her feel any worse than she is right now if I can be of assistance to her.

> "So I am going to bring her back out by herself, instruct her that I want her to try to go see her doctor; that we are going to recess until tomorrow; that our goal is to have her continue on this jury, and I want to try to accommodate that by allowing her to receive the necessary medical care that she needs in order to fulfill her duties as a juror.

> "We are just going to have to take it day by day. I will instruct her to come back tomorrow morning at nine o'clock, unless her doctor gives her some written instructions not to do so, and that if she cannot be here at nine o'clock tomorrow because of some instructions from her doctor then she is to contact the Court. And we will follow up from there the way we do anytime we have a juror that's sick.

> "So I am not going to make any assumption about Juror No. 2 because of her race or ethnicity. I am not going to make any assumption that she is either the holdout or, you know, part of the 11 or part of the one. And I am going to treat her the same way I would any other juror who tells me that I am so sick I can't continue right now, I need to see my doctor. And I am not going to discriminate against her for any reason. And so I am going to bring her out, confirm my instructions, bring out the other 11, send them all home, order them back at nine o'clock."

The following morning (Friday, March 12, 2010), Juror No. 2 advised the trial court she had seen her doctor and had been given a steroid shot. She further advised that her doctor wanted her to stay home and rest that day, and provided the court with a doctor's note to that effect.

The court thereafter conferred with the attorneys and advised them that it planned to bring the jurors in and "just explain that the Court is going to let the jury have a recess today because of Juror No. 2's medical condition and we are going to come back Monday morning." The court then denied a request by Jones's attorney to ask the jurors "whether or not they are now at an impasse that they cannot move from." The court explained:

> "Well, we made a record on this yesterday, and my finding yesterday was that I had instructed the jurors to discuss among themselves if there's anything the Court could do to assist them. After I gave them those suggestions and directions, I then found I had a juror that was not able to participate in the deliberations because of her physical and medical condition. And she told us all she was having trouble breathing. And I can't expect her to be functioning in a normal manner even to discuss things the Court might do to assist if she is back there struggling for breath. So I am going to deny your request."

After the jurors went into recess, the defense attorneys renewed their motion for a mistrial. The court denied the motion, observing:

> "... [W]hat I told the jurors to do is to come back Monday morning, and at 9:00, to continue with their deliberations.

> "I think I must say that when there are all 12 back in the jury room, they are deliberating. And in order to hopefully remove any suggestion that the Court was in any way trying to be coercive, I specifically reminded them that they are going to be asked to discuss among themselves the Court had suggested that they talk about to see if there's anything the Court can do to assist the jury.

> "That was my way of trying to be inputting less pressure on any minority jurors in terms of voting because I am not telling them now you have to come back and reach a verdict. I am saying come back and continue deliberating, which is what jurors do when they are in the jury room, and also pointing out that I still expect them to discuss among themselves if there is anything the Court can do to assist them in reaching a verdict if they can do so. So I don't feel I have done anything that puts any coercive pressure on any juror."

The following Monday (March 15, 2010), the jury resumed deliberations at 9:22 a.m., after the court ascertained from Juror No. 2 that she felt well enough to perform her duties as a juror. The defense attorneys then raised a joint objection to the court's handling, the previous Thursday, of the jury's second note stating it was at an impasse. Defense counsel complained, "what your Honor did was basically disregard that note and send them back pursuant to your Honor's intention to continue with the jury deliberations." The court overruled the objection, noting:

> "In response, I believe I addressed pretty much the same subject on Friday of last week. And my analysis of the situation was that we had a juror who was back in the jury room who informed me, after we received the note, that she was having trouble breathing. And I made a finding that she was not capable of deliberating in that physical and medical condition. And so I want to have 12 functioning jurors to be able to discuss the subjects that the Court raised with them before I take any further action as far as whether the jury is at an impasse."

At 11:05 a.m., the court received a note advising that the jury had reached a verdict. After the court received and reviewed the verdict forms, it called a recess of the jury in order to talk to the attorneys. The court then advised them that the

verdicts and findings were incomplete, explaining "based upon the verdicts as to both the defendants, the jurors have failed to make certain findings as to whether allegations are true or not true."

Next, the trial court brought the jurors back in and advised them of the problem with the verdict forms and instructed them "to go back into the jury room, deliberate further as to those findings that are still unfilled by the jury.... There are certain findings that you have left blank, and it's your duty to deliberate and try to reach verdicts as to whether those findings are either true or not true."

The jury retired to continue deliberations at 11:50 a.m. At 12:01 p.m., the court ordered an adjournment for the jurors to take a lunch break. Deliberations resumed at 1:30 p.m. At 1:35 p.m. the court received a note stating, "We believe we have finished the paperwork."

The jury thereafter returned its verdict of guilty for all counts and returned true findings on all the special allegations. The trial court noted that the jury's true findings on the personal weapon discharge allegation (§ 12022.53, subd. (d)) for both appellants was inconsistent with the evidence that a single firearm was responsible for the fatal shot, and noted that it could later strike these allegations, which it ultimately did. Jones's attorney suggested the inconsistent findings were indicative jurors were coerced into rendering a verdict.

The trial court later denied appellants' joint motions for a new trial, which alleged that the court had coerced the jury's verdict on counts 1 and 2.

*2. Analysis*

Jones contends the trial court erred "by ignoring the jury's *second* statement of impasse and denying the defense mistrial motion; by refusing the defense request to question the ill juror as to whether she was the lone holdout in order to ascertain whether she was being subjected to undue pressure by her fellow jurors; and by instead simply ordering the jury to continue its deliberations on several occasions until the jury returned a guilty verdict." He concludes that "[t]he cumulative effect of the court's instructions was impermissibly coercive." We find these claims unpersuasive. The record demonstrates the trial court not only handled the situation properly, but went to great and commendable lengths to ensure none of the jurors felt the court was pressuring him or her to arrive at a verdict if unable to do so.

" 'The applicable legal principles are well established. Under section 1140, the trial court is precluded from discharging the jury without reaching a verdict unless both parties consent or "unless, at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree." ' " (*People v. Neufer* (1994) 30 Cal.App.4th 244, 254; *People v. Breaux* (1991) 1 Cal.4th 281, 318–319.) " ' " 'The determination whether there is reasonable probability of agreement rests in the sound discretion of the trial court. [Citation.] The court must exercise its power, however, without coercion of the jury, so as to avoid displacing the jury's independent judgment 'in favor of considerations of compromise and expediency." [Citation.]' " (*Neufer, supra,* at p. 254; *Breaux, supra,* at p. 319.)

It is well-settled that sending the jury back to continue deliberations even after it has indicated a deadlock is generally proper. (See, e.g., *People v. Pride* (1992) 3 Cal.4th 195, 265–266 [trial court may instruct jurors who report a deadlock to

continue deliberating if there is a reasonable probability they may be able to reach a verdict]; *People v. Johnson* (1992) 3 Cal.4th 1183, 1252–1254 [no coercion where trial court ordered jury to continue deliberations after it reported it was deadlocked 11–1]; *People v. Gill* (1997) 60 Cal.App.4th 743, 747–749 [trial court did not coerce verdict where it sent jury back to continue deliberating after jurors indicated 11–1 division].)

Under the foregoing authorities, it was not error for the trial court to ask the jury to continue deliberating after receiving the second note stating it was at an impasse. (See also *People v. Rodriguez* (1986) 42 Cal.3d 730, 774–777 [trial court did not err in requesting jury to continue deliberations despite its repeated declarations of an impasse, given complexity of trial evidence].) As respondent observes, and Jones does not refute, numerous state court decisions have held no coercion occurred in similar circumstances.

However, because the jury did not request any of the forms of assistance offered by the trial court in response to the jury's first note, Jones claims that "[o]bviously, the jury felt no further assistance by the court was necessary" and suggests the trial court should have declared a mistrial after its receipt of the jury's second note. We disagree. As the trial court explained each time it rejected this argument, which was made repeatedly by defense counsel below, the jury could not meaningfully avail itself of the court's offer of assistance where one of the jurors was demonstrably ill and unable to participate fully in deliberations. The court's explanation was reasonable and is supported by the record, which shows Juror No. 2, who suffered from asthma, was having difficulty breathing during the afternoon when the court received the jury's two notes. The record further shows Juror No. 2 was able to resume her duties as a juror after she received medical treatment and was given an opportunity to rest. On this record, the trial court did not abuse its discretion by implicitly concluding there was a reasonable probability of an agreement and ordering the jury to continue deliberating after it received the jury's second note.

Jones also relies on *Jiminez v. Myers* (9th Cir.1993) 40 F.3d 976 (*Jiminez*) to support his contention that the actions taken by the trial court were coercive. In *Jiminez,* after nearly five hours of deliberations, the jury stated it was unable to reach a verdict. The court inquired as to the number of votes taken and the results of the most recent vote. The foreperson responded that five or six votes had been taken and the most recent vote had a numerical division of 9 to 3. The judge then inquired as to whether there had been movement, and the foreperson said there had been movement in one direction. After a three-day weekend, the jury returned to its deliberations. Three hours later, the jury sent a note advising the court it was at an impasse. Both counsel agreed the jury was hung and the case should be set for retrial. However, the court inquired of the jury as to the numerical division and, upon learning it was 11 to 1, instructed the jurors to continue deliberating for the rest of the day. (*Jiminez, supra,* at pp. 978–979.)

In holding the trial court's action amounted to an improper *Allen* charge, the Ninth Circuit concluded the trial court sent, "a clear message that the jurors in the majority were to hold their position and persuade a single hold-out juror to join in a unanimous verdict, and the hold-out juror was to cooperate in the movement toward unanimity." (*Jiminez, supra,* 40 F.3d at p. 981.) The Ninth Circuit reasoned the trial court's instruction was implicitly coercive to the single juror who had not moved in the court's favored position, and thus, the defendant did not have the benefit of an impartial and unanimous jury and fair trial. (*Ibid.*)

21

The decision in *Jiminez* is not binding on this court. (*People v. Zapien* (1993) 4 Cal.4th 929, 989.) Nor is it factually apposite. Here, the trial court's response to the jury's second note did not implicitly approve the jury's movement in one direction. After questioning Juror No. 2 about her health condition, the court made no remarks, either to Juror No. 2 or to the jury as a whole, which could be construed as encouraging any holdout juror to follow the majority. Moreover, when the court addressed the jury the following day, before ordering a recess to give Juror No. 2 a day (plus the weekend) to rest, the court reminded the jurors of its previous offer of assistance and suggested that, when they resumed deliberations on Monday, "to talk ... among yourselves to see if there is anything the Court can do to assist the jury in reaching verdicts *if you could do so.*" (Italics added.) The record reflects the trial court deliberately added the qualifier *if you can do so* several times in its instructions to communicate to jurors, "If they can decide the case, that's fine. If they can't, that's fine too." The trial court's comments in this case are plainly different than those the Ninth Circuit condemned in *Jiminez, supra*, 40 F.3d 976. It bears repeating that the trial court in this case made a commendable effort to avoid making any coercive comments to the jury.

Finally, we reject Jones's contention that the trial court erred by denying defense counsel's request to question Juror No. 2 about whether she was a holdout juror and being pressured by the other jurors. The authority he cites in support of his contention, *People v. Castorena* (1996) 47 Cal.App.4th 1051 (*Castorena*), is inapposite. The court in *Castorena* held that the lower court prejudicially abused its discretion when it failed to conduct an adequate inquiry into allegations of juror misconduct where the trial court "did not have the requisite facts upon which to decide whether [the discharged juror] in fact failed to carry out her duty as a juror to deliberate or whether the jury's inability to reach a verdict was due, instead, simply to [the juror's] legitimate disagreement with the other jurors." (*Castorena*, supra, 47 Cal.App.4th at p. 1066.) Further inquiry was particularly important given that the discharged juror submitted a written response to the complaints of the other jurors. (*Ibid.*)

The circumstances here did not warrant further inquiry. Apart from the speculation of defense counsel, there was no evidence that Juror No. 2's reported illness and initial request to be excused was indicative of juror misconduct. When questioned by the trial court, Juror No. 2 made no statements suggesting either that she was a holdout juror or that her asthma was triggered or exacerbated by being unduly pressured to agree with the other jurors. Juror No. 2's answers revealed that her asthmatic condition had been present even before deliberations commenced, including during the week-long recess at the end of February, when she was not in the company of her fellow jurors. These circumstances, combined with Juror No. 2's expressed willingness to resume her duties as a juror once she received medical treatment, tend to contradict the theory advanced by the defense attorneys below that she was using or exaggerating her illness to try to avoid further pressure from the other jurors to join the majority vote. On this record, we believe the trial court wisely refrained from making "any assumption about Juror No. 2 because of her race or ethnicity" or "any assumption that she is either the holdout or, you know, part of the 11 or part of the one" and limited the scope of its questioning to her health condition.

Perkins, 2012 WL 1774826, at *21-29 (footnotes omitted).

///

1    **a.  Supplemental Jury Charge**

2        "Any criminal defendant . . . being tried by a jury is entitled to the uncoerced verdict of

3    that body." Lowenfield v. Phelps, 484 U.S. 231, 241 (1988). Supplemental charges to encourage

4    a deadlocked jury to try to reach a verdict are not coercive per se, and the Supreme Court has

5    reaffirmed the "continuing validity" of the "traditional Allen[4] charge," which urges jurors in "the

6    minority to consider the views of the majority, and ask themselves whether their own views were

7    reasonable under the circumstances." Id. at 237-38. To determine whether an instruction to a

8    deadlocked jury is coercive and denies a defendant his due process right to trial by a fair and

9    impartial jury, courts must "consider the supplemental charge given by the trial court 'in its

10   context and under all the circumstances.'" Id. at 237 (quoting Jenkins v. United States, 380 U.S.

11   445, 446 (1965) (per curiam)).

12       The clearly established federal law governing unconstitutionally coercive jury

13   instructions is sparse and provides very little guidance. See Wong v. Smith, 562 U.S. 1021, 1023

14   (2010) (Alito, J., dissenting from denial of certiorari). In Lowenfield, the jury sent the judge a

15   note stating they were unable to reach a decision during the second day of sentencing

16   deliberations. 484 U.S. at 234. The court polled the jury as to whether "further deliberations

17   would be helpful in obtaining a verdict" by having the jurors write their names on pieces of

18   paper and answering the question. Id. Eight jurors believed further deliberation would be helpful

19   and four did not. As some of the jurors had misunderstood the question, the judge polled the jury

20   again with the same method and asked, "Do you feel that any further deliberation will enable you

21   to arrive at a verdict?" Id. Eleven jurors answered in the affirmative and one in the negative. Id.

22   at 234-35. The court then gave the following supplemental charge:

23           When you enter the jury room it is your duty to consult with one
             another to consider each other's views and to discuss the evidence
24           with the objective of reaching a just verdict if you can do so
             without violence to that individual judgment.
25
             Each of you must decide the case for yourself but only after
26           discussion and impartial consideration of the case with your fellow
             jurors. You are not advocates for one side or the other. Do not
27

28   _____
     [4] Allen v. United States, 164 U.S. 492 (1896).

> hesitate to reexamine your own views and to change your opinion if you are convinced you are wrong but do not surrender your honest belief as to the weight and effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict."

Id. at 235. Thirty minutes later, the jury returned with a verdict sentencing the defendant to death. Id. The Supreme Court found that the instruction was not unconstitutionally coercive, but limited its holding to the facts of the case, noting that "[b]y so holding we do not mean to be understood as saying other combinations of supplemental charges and polling might not require a different conclusion." Id. at 241.

In Early v. Packer, 537 U.S. 3 (2002) (per curiam), one juror requested that she be dismissed from the jury due to health problems after twenty-eight hours of deliberation. The trial judge met with the juror alone, and the juror explained that because of the seriousness of the charges she could not make snap decisions and was beginning to feel a little burned out. When the juror agreed to "hold out just a little bit longer," the judge replied, "I really appreciate it. Otherwise, they have to start deliberations all over again with another person." Id. at 4. The following day, the foreperson sent a note to the judge indicating the jury could no longer deliberate and that nearly all the jurors questioned the one juror's "ability to understand the rules and her ability to reason." Id. The trial judge read the note aloud to the jury, stated that a juror has "a right to disagree with everybody else," inquired as to the latest vote count (which had been eleven to one), and then instructed the jury that they were to apply the law as stated by the court to the facts as the jury found them. Id. at 4-6. During the next day of deliberations, the one juror again requested to be dismissed from the jury. The trial judge met with the juror in chambers outside the presence of the parties and counsel. After ascertaining that she continued to deliberate, the judge thanked her and returned her to the jury room. After two more days of deliberations, the jury returned with a guilty verdict. Id. at 6. Applying the AEDPA's deferential standard of review, the Supreme Court reversed the grant of habeas relief because the state court's decision that there was no jury coercion was not contrary to, or an unreasonable application of, clearly established Supreme Court law. Id. at 10-11.

In Petitioner's case, the jury sent a note indicating they were at an eleven-to-one impasse

in the afternoon of the fourth day of deliberations. <u>Perkins</u>, 2012 WL 1774826, at *21. Thereafter, the trial judge "advise[d] the jury of its duty to decide the case, if you can do so, based on the evidence while keeping an open mind and talking about the evidence with each other." <u>Id.</u> at *22. The trial judge also offered possible court actions that might assist the jury in reaching a verdict, such as readback of testimony, additional instructions, clarification of previous instructions, or additional closing arguments. <u>Id.</u> The trial court's instruction did not encourage the jurors to give up their own judgments so that they could reach a verdict. In fact, the court clearly stated that the jury did not have to reach a verdict when it said:

> [L]et me also make it very clear that the Court is not in any way indicating that I have any preference as to any verdict that the jury may reach. I am not trying to coerce you in any way to reach a verdict. All I am trying to do is say is there anything I can do to assist the jury in reaching a verdict. So that's the purpose of my comments to you. It's just to invite you to consider among yourselves if there is anything the Court can do to assist the jury in reaching a verdict, if you can do so. And that is not, in any way, meant to be coercive or to put undue pressure on anyone.

<u>Id.</u>

Later that same afternoon, the trial court received the jury's second statement of impasse, which also indicated that one of the jurors was ill and wished to be excused. <u>Id.</u> at *23. The court denied the defense's request to ask the ill juror whether she was the holdout. <u>Id.</u> at *24. After questioning the juror about her illness, the court recessed for the day. The next morning, the ill juror provided a doctor's note advising that she stay at home and rest for the day. <u>Id.</u> at *25. The court explained to the jury that it was recessing for the day due to the juror's illness and stated:

> We are going to have you all come back Monday morning at 9:00 to continue with your deliberations. And, again, reminding you that the Court had asked the jurors to discuss certain things that I had suggested to talk about among yourselves to see if there is anything the Court can do to assist the jury in reaching verdicts *if you could do so*. And we would expect that you would come back Monday morning to continue with deliberations, as well as considering the things that the Court talked to you about.

20 RT[5] 4180-81 (emphasis added).

---

[5] "RT" refers to the Reporter's Transcript on Appeal in Case No. F060071, which Respondent lodged as Item 2. (ECF No. 15).

The facts of the instant case do not warrant a different result from <u>Early</u>, in which the Supreme Court upheld the state appellate court's determination that there was no unconstitutional coercion, finding that the decision was neither contrary to nor an unreasonable application of clearly established federal law. The trial court in the instant case did not go nearly as far to encourage the jury to reach a verdict as the trial court in <u>Early</u>. Unlike in <u>Early</u>, in which the trial judge inquired as to the vote count, here the jury volunteered that information in its note, in violation of the court's instruction. <u>Perkins</u>, 2012 WL 1774826, at *22. Moreover, the trial court in the instant case was not aware of the identity of the holdout juror[6] and did not single out the holdout juror with an individual audience encouraging further deliberation.

<u>Parker v. Small</u>, 665 F.3d 1143 (9th Cir. 2011), also supports this conclusion. In <u>Parker</u>, the trial court knew both the division of the jurors and the reason for a single holdout juror's unwillingness to convict. 665 F.3d at 1145. In its supplemental charge, the trial court advised the jury of its duty "to deliberate with the goal of arriving at a verdict on the charge if you can do so without violence to your individual judgment." <u>Id.</u> at 1146. The trial court also suggested the jury try new methods of deliberation and gave examples as to what they could do differently, such as having different jurors leading the discussions or having those on one side of an issue present and argue the other side's position. <u>Id.</u> The Ninth Circuit held that the state court's determination that there was no jury coercion was not contrary to, or an unreasonable application of, clearly established federal law. <u>Id.</u> at 1148. Here, the trial court similarly advised the jury of its duty to deliberate and offered possible court actions that might assist the jury, such as readback of testimony, additional instructions, clarification of previous instructions, or additional closing arguments. The facts of the instant case are not sufficiently distinguishable from those in <u>Parker</u> to warrant a different result.

The Court finds that the California Court of Appeal's decision was not contrary to, or an

---

[6] Petitioner claims that the ill juror may have been the holdout juror and that the illness may have been related to coercion that the holdout juror felt. However, there is nothing in the record to support that contention. There is nothing in the record indicating that the ill juror was the holdout juror. When the court questioned the ill juror, the ill juror did not mention that she was feeling ill because of pressure and she did not request to be removed from the jury. The trial court's decision not to inquire whether the ill juror was the sole holdout did not make the subsequent instructions and decision to continue deliberations coercive.

1    unreasonable application of, clearly established federal law.[7] The California Court of Appeal

2    properly considered Petitioner's jury coercion claim based on the totality of the circumstances in

3    compliance with <u>Lowenfield</u>, and distinguished <u>Jiminez v. Myers</u>, 40 F.3d 976 (9th Cir. 1993),

4    emphasizing that "the trial court deliberately added the qualifier *if you can do so* several times in

5    its instructions" in "a commendable effort to avoid making any coercive comments to the jury."

6    <u>Perkins</u>, 2012 WL 1774826, at *29. The California Court of Appeal's ruling that the trial court's

7    actions were not coercive is not "so lacking in justification that there was an error well

8    understood and comprehended in existing law beyond any possibility for fairminded

9    disagreement." <u>Richter</u>, 562 U.S. at 103. As fairminded jurists could disagree whether the state

10   court's decision conflicts with the Supreme Court's precedent, the Court must defer to the state

11   court's decision. Accordingly, Petitioner is not entitled to habeas relief on his first claim and it

12   must be denied.

13                      **b.  Inquiry Whether Ill Juror was the Sole Holdout**

14          In his second claim for relief, Petitioner argues that his due process rights were violated

15   when the trial court refused to ascertain whether the ill juror was the holdout juror and subject to

16   any undue pressure. (ECF No. 1 at 6). The two Supreme Court cases implicated by Petitioner's

17   second claim are <u>Remmer v. United States</u>, 347 U.S. 227 (1954), and <u>Smith v. Phillips</u>, 455 U.S.

18   209 (1982). In <u>Remmer</u>, a juror in a federal criminal trial was contacted by a third party who

19   communicated that the juror could profit by bringing in a verdict favorable to the defendant. 347

20   U.S. at 228. The juror reported the incident to the trial judge, who discussed it with the

21   prosecutors but not the defense. The Federal Bureau of Investigation was requested to investigate

22   and based on the ensuing report, the trial judge and prosecutors concluded that the statement was

23   made in jest. The defense learned about the incident after the jury returned its verdict and moved

24   for a new trial. The district court denied the motion without holding a hearing. <u>Id.</u> at 228-29. The

25   Supreme Court reversed, finding that the "trial court should not decide and take final action *ex*

26   *parte* on information such as was received in this case, but should determine the circumstances,

---

[7] Although the California Court of Appeal did not explicitly reference any Supreme Court authority on this issue, the pertinent inquiry is whether it "reasonably applied the principles contained in relevant Supreme Court precedent." <u>Parker</u>, 665 F.3d at 1148 (citing <u>Early</u>, 537 U.S. at 8).

1   the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all

2   interested parties permitted to participate." Id. at 229-30.

3       Smith involved a juror in a state criminal trial who, during the trial, applied for an

4   investigator position in the state prosecutor's office. 455 U.S. at 212. Although the prosecuting

5   attorneys knew of the juror's application, they chose not to inform the court or the defense until

6   after the jury returned the verdict. Id. at 212-13. After holding a hearing in which the juror and

7   prosecutors testified, the trial court denied the defendant's motion to vacate his conviction,

8   finding that the juror was not biased and that the evidence did not suggest a "sinister or dishonest

9   motive" on the part of the prosecutors. Id. at 213-14. The Supreme Court reversed the lower

10  federal court's grant of habeas relief, finding that the trial court's hearing was sufficient to

11  comply with due process. Id. at 217-18.

12      The Ninth Circuit has "interpreted Smith and Remmer as providing a flexible rule."

13  Tracey v. Palmateer, 341 F.3d 1037, 1044 (9th Cir. 2003). "Remmer's command that hearings

14  are warranted in *every* case is unique to the tampering context," and "Smith leaves open the door

15  as to whether a hearing is always required and what else may be 'sufficient' to alleviate any due

16  process concerns" Id. Thus, "[a]n evidentiary hearing is not mandated *every* time there is an

17  allegation of jury misconduct or bias." Id. (alteration in original) (quoting United States v.

18  Angulo, 4 F.3d 843, 847 (9th Cir. 1993)). In Tracey, the Ninth Circuit held that a state court's

19  refusal to question a juror further about the names of two other jurors who spoke negatively

20  about the defendant and to take additional testimony from those two jurors was not contrary to,

21  or an unreasonable application of, Supreme Court precedent. 341 F.3d at 1044. The Ninth Circuit

22  noted that although an evidentiary hearing was not required, the state court did in fact hold a

23  hearing on the record with the parties present, and its decision not to hold a more in-depth

24  hearing "was the kind of discretionary inquiry best left to the sound judgment of the trial judge."

25  Id. at 1045. Similarly, here, the California Court of Appeal held that the trial court did not err in

26  denying the defense's request to question the ill juror as to whether she was the holdout juror and

27  subject to any undue pressure. The court found that further inquiry was not warranted because

28  when the ill juror was questioned, she made no statements suggesting she was the holdout or that

her asthma was triggered or exacerbated by any undue pressure to agree with the majority.

The Court finds that the California Court of Appeal's decision is not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court.[8] <u>Remmer</u> and <u>Smith</u> do not mandate an evidentiary hearing whenever there is an allegation of jury misconduct or bias, and "<u>Smith</u> leaves open the door as to . . . what else may be 'sufficient' to alleviate any due process concerns." <u>Tracey</u>, 341 F.3d at 1044. The California Court of Appeal's denial of the due process claim is not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Richter</u>, 562 U.S. at 103. As fairminded jurists could disagree whether the state court's decision conflicts with the Supreme Court's precedent, the Court must defer to the state court's decision. Accordingly, Petitioner is not entitled to habeas relief on his second claim and it must be denied.

    2. <u>Public Trial Claim</u>

In Petitioner's third claim for relief, Petitioner argues that his right to a public trial under the Sixth Amendment was violated when the trial court held the audience in the courtroom while the jurors left the building and denied Petitioner's request for his investigator to be allowed to leave the courtroom to contact the jurors regarding whether any impropriety occurred in the jury room or with the holdout juror. (ECF No. 1 at 7). This claim was presented on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The California Supreme Court summarily denied Petitioner's petition for review. The Court reviews the last reasoned state court opinion. <u>Ylst</u>, 501 U.S. at 806.

In denying this claim, the California Court of Appeal stated:

*C. The Trial Court Did Not Violate Appellants' Right to a Public Trial*

During the afternoon session on March 15, 2010, the trial court, observing the presence of a large group of spectators in the courtroom, admonished them that it would not tolerate any emotional displays when the verdict was read and advised "no persons in the courtroom, including the audience section, will be allowed to

---

[8] Although the California Court of Appeal did not cite to any federal authority on this issue, the pertinent inquiry is whether it "reasonably applied the principles contained in relevant Supreme Court precedent." <u>Parker</u>, 665 F.3d at 1148 (citing <u>Early</u>, 537 U.S. at 8). The Supreme Court has noted that a state court is not required to cite or even be aware of its cases under § 2254(d). <u>Early</u>, 537 U.S. at 8.

leave the courtroom until after the jurors have exited the court building." When Jones's counsel complained that the court was locking the courtroom doors and that it was "a public hearing and people have a right to be here," the court stated that the doors would be unlocked and advised the bailiff, "if anyone comes in while we are in session you can inform them they are to be seated, they are not to leave until the Court so instructs."

Jones now claims he was denied the constitutional right to a public trial when the court, for security purposes, required the audience to remain in the courtroom until the jurors left the courthouse. Because the public was not excluded from courtroom proceedings, this claim fails.

The Sixth Amendment of the United States Constitution guarantees the accused "a speedy and public trial." California Constitution also guarantees the "right to public trial of criminal cases." (*People v. Esquibel* (2008) 166 Cal.App.4th 539, 551, fn. 6.) "The observance of the right to a public trial precludes the closure of substantive courtroom proceedings in criminal cases." (*Id.* at p. 551.) Cases that have concluded a defendant was denied a public trial involved situations where the general public was entirely or substantially excluded from trial or pretrial proceedings. (See, e.g., *Presley v. Georgia* (2010) 130 S.Ct. 721 [public excluded from voir dire]; *Waller v. Georgia* (1984) 467 U.S. 39, 48–50 (*Waller*) [public excluded from suppression hearing]; *People v. Byrnes* (1948) 84 Cal.App.2d 72, 78–80 [entire trial].)

" ' " 'The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions....' " ' [Citations.] [¶] In addition to ensuring that judge and prosecutor carry out their duties responsibly, a public trial encourages witnesses to come forward and discourages perjury. [Citations.]" (*Waller, supra,* 467 U.S. at p. 46, fn. omitted.)

None of these principles were violated in this case. As Jones acknowledges, the courtroom was not closed to the general public. The doors were left unlocked so spectators could still gain entrance and observe the proceedings. Spectators already in the courtroom were simply prevented from leaving until after the jurors had left the courthouse. We are unpersuaded by Jones's claim, which admittedly lacks direct supporting authority that the court's security measures implicated or impinged on his right to a public trial. Jones complains that "by detaining the audience until after the jury left, the court effectively prevented his investigator from inquiring into the jury impasse issue described above." Even assuming this is true, it does not establish Jones was denied his constitutional right to a public trial.

Perkins, 2012 WL 1774826, at *29-30 (footnote omitted).

There is no clearly established Supreme Court precedent that requiring spectators to remain in a courtroom implicates the right to a public trial. The Supreme Court has recognized that the right to a public trial entails a "presumption of openness [that] may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." Waller v. Georgia, 467 U.S. 39, 45 (1984) (quoting

30

1   Press-Enterprise Co. v. Superior Court of California, 464 U.S. 501, 510 (1984)). Here, the

2   courtroom was not closed; the courtroom was open and spectators could enter the courtroom.

3   The trial court only directed that once spectators entered the courtroom when the verdict was

4   read, they were to be seated and were required to stay in the courtroom until the jurors had left

5   the courthouse. Supreme Court precedent with respect to the public trial right has involved

6   circumstances in which the public has been excluded from proceedings, not where the public was

7   present and required to remain in the courtroom. See, e.g., Presley v. Georgia, 558 U.S. 209

8   (2010) (public excluded from the *voir dire* of prospective jurors); Waller, 467 U.S. 39 (public

9   excluded from pretrial suppression hearing); Globe Newspaper Co. v. Superior Court for Norfolk

10  County, 457 U.S. 596 (1982) (public excluded from entire criminal trial). As there is no clearly

11  established federal law that requiring spectators to remain in a courtroom implicates the right to a

12  public trial under the Sixth Amendment, the Court must defer to the state court's decision.

13  Accordingly, Petitioner is not entitled to habeas relief on his third claim and it must be denied.

14          3.   Post-Trial Juror Access and Release of Personal Juror Identifying Information

15          Petitioner argues that his rights to an impartial jury and due process under the Sixth and

16  Fourteenth Amendments were violated when the trial court prevented the defense from contact

17  with the jury after the verdict was returned and subsequently refused to release personal juror

18  identifying information, and specifically, the information of Juror No. 2, who was the ill juror

19  and whom the defense believed was the holdout juror. (ECF No. 1 at 8). This claim was

20  presented on direct appeal to the California Court of Appeal, Fifth Appellate District, which

21  denied the claim in a reasoned decision. The California Supreme Court summarily denied

22  Petitioner's petition for review. The Court reviews the last reasoned state court opinion. Ylst,

23  501 U.S. at 806.

24          In denying this claim, the California Court of Appeal stated:

25          Jones contends the trial court erred in denying appellants' joint motion for
            disclosure of the jurors' personal identifying information. The motion was made
26          on the ground "the defense needs ... to determine if there was any jury misconduct
            relating to the holdout juror who voted not guilty on Thursday, March 11, 2010,
27          and then voted guilty on Monday, March 15, 2010."

28

During the hearing on the motion, Perkins's counsel argued, *inter alia*, "[w]e had a specific reason for believing there was a connection between an impasse, a sick juror, a weekend, a jury that returns, a failure to address the impasse note, and then a verdict." Counsel urged, "at a minimum, the Court should give us at least the identifying information as to Juror No. 2, the juror who came up claiming sickness after the second impasse note came out."

In response to counsel's argument, the court made the following observations:

> "Well, let's look at what transpired. If that's your argument that that establishes a prima facie case, you are drawing inferences from those chain of events that there was a note about the impasse and also one juror's ill and wants to be excused. Then Juror No. 2 identifies herself as the one who is ill and wants to be excused. There's a record, and you all have the transcript as to what she told the Court.

> "She said nothing about any type of misconduct or any type of improper activity within the jury room. She said nothing about feeling that she was being placed under some type of undue pressure or coercion that might be a reason why she is wanting to be excused. So everything that she said was consistent with—I'm just offering my thoughts on this, and you can respond.

> "Everything that she said was consistent with the juror who was experiencing some acute symptoms of asthma and asking to—after the Court confirmed that rather than excuse her for illness that I would ask her if she could go see her doctor and explore that, she indicated a willingness to do that.

> "So then the next morning she comes back. She had seen the doctor. She had received medication. And the doctor had told her rather than asking to be excused at that point—and I think that's significant. Rather than asking to be excused the following morning, she indicates her willingness to take the day to rest as per the doctor's orders and to then see if she is well enough to continue Monday. So she comes back Monday morning, saying that now she's feeling well enough to continue to perform her duties.

> "And, again, there was never any suggestion by her that there was some type of improper conduct or juror misconduct going on that had triggered her initial statements that she was ill and wanted to be excused. So I am trying to understand how all of her subsequent actions would be consistent with a juror who was feeling some type of pressure that caused her to feign illness in order to be excused."

After listening to extensive arguments from the attorneys, the court denied the motion, stating:

> ". . . I do not find that defense counsel have set forth a sufficient showing to support a reasonable belief that jury misconduct occurred. [¶] I also am going to note that, absent a satisfactory preliminary showing of possible juror misconduct, the strong public interests and the integrity of our jury system and a juror's right to privacy outweigh the countervailing public interest served

by disclosure of the juror information. [¶] . . . [¶] With regard to the requirements of CCP Section 237, I do find and I will make express findings that there's been a lack of prima facie showing of good cause for the disclosure of the jurors' personal identifying information. And those are my findings. Petitions are denied."

Following a verdict, a defendant may "petition the court for access to personal juror identifying information within the court's records necessary for the defendant to communicate with jurors for the purpose of developing a motion for new trial or any other lawful purpose." (Code Civ. Proc., § 206, subd. (g).) "The petition shall be supported by a declaration that includes facts sufficient to establish good cause for the release of the juror's personal identifying information. The court shall set the matter for hearing if the petition and supporting declaration establish a prima facie showing of good cause for the release" of the requested information. (Code Civ. Proc., § 237, subd. (b).)

Good cause for disclosure of juror information to support a motion for new trial based on juror misconduct is "a sufficient showing to support a reasonable belief that jury misconduct occurred." (*People v. Rhodes* (1989) 212 Cal.App.3d 541, 552; *People v. Jefflo* (1998) 63 Cal.App.4th 1314, 1322.) There is no good cause where allegations of jury misconduct are speculative, conclusory, or unsupported, or the alleged misconduct is not "of such a character as is likely to have influenced the verdict improperly." (Evid. Code, § 1150, subd. (a); see *Rhodes, supra*, at p. 552.) We review the denial of a petition for disclosure for an abuse of discretion. (*People v. Jones* (1998) 17 Cal.4th 279, 317.)

Jones's claim that the trial court abused its discretion in denying appellants' motion to disclose personal juror identifying information need not detain us long. We agree with the astute observations made by the trial court during the hearing and its rationale for denying the motion. Jones has failed to demonstrate and the record reveals no abuse of discretion by the trial court.

Because we conclude the trial court did not commit any errors concerning the jury's deliberations, we also reject Jones's related assertion that "the cumulative effects" of the alleged errors was to deprive him of his federal constitutional rights to due process and an impartial jury.

Perkins, 2012 WL 1774826, at *30-32.

Whether the trial judge abused his discretion under California state law in denying the defense's motion to release personal juror identifying information is not cognizable in federal habeas proceedings. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"). The pertinent question is whether the trial court's decision not to allow the defense investigator to leave the courtroom to interview jurors after the verdict was returned and not to release personal juror identifying information violated Petitioner's constitutional rights to an impartial jury and due process. Petitioner provides no authority to support his claim, and the Court has not found a

33

1    Supreme Court case that requires a state court to permit a party to have post-trial access to jurors
2    or post-trial access to personal juror identifying information. As there is no clearly established
3    federal law governing when a state court is required to allow post-trial access to jurors and their
4    personal identifying information, the Court must defer to the state court's decision. Accordingly,
5    Petitioner is not entitled to habeas relief on his fourth claim and it must be denied.

6            4.   Corroboration of Accomplice Testimony

7            In his fifth claim for relief, Petitioner argues that the prosecution violated his due process
8    rights by failing to present sufficient evidence to corroborate accomplice Torino Jackson's
9    testimony. Petitioner states that the prosecution presented evidence relating to codefendant
10   Wayne Perkins's guilt, but this evidence was limited exclusively to Perkins. (ECF No. 1 at 9).
11   This claim was presented on direct appeal to the California Court of Appeal, Fifth Appellate
12   District, which found no error under California Penal Code section 1111 because there was
13   sufficient evidence to corroborate the accomplice's testimony. The California Supreme Court
14   summarily denied Petitioner's petition for review. The Court reviews the last reasoned state court
15   opinion. Ylst, 501 U.S. at 806. Although the California Court of Appeal did not expressly
16   address the federal due process claim underlying the alleged violation of California Penal Code
17   section 1111, the Court presumes that the state court adjudicated the federal claim on the merits.
18   See Johnson, 133 S. Ct. at 1096. Accordingly, the AEDPA's deferential standard of review
19   applies.

20           The California Court of Appeal stated:

21           We will begin by addressing Perkins's first contention on appeal, in which he
             claims his convictions on counts 1 and 2 must be reversed because the
22           prosecution failed to present sufficient evidence to corroborate the testimony of
             accomplice Torino Jackson as required by section 1111, and without Jackson's
23           testimony, the evidence was insufficient to support the convictions. For reasons
             discussed below, we disagree with this contention and conclude Jackson's
24           testimony was sufficiently corroborated.

25           *A. Relevant authority*

26           Section 1111 provides in pertinent part: "A conviction cannot be had upon the
             testimony of an accomplice unless it be corroborated by such other evidence as
27           shall tend to connect the defendant with the commission of the offense; and the
             corroboration is not sufficient if it merely shows the commission of the offense or
28           the circumstances thereof." Thus, the testimony of an accomplice "has been

legislatively determined never to be sufficiently trustworthy to establish guilt beyond a reasonable doubt unless corroborated." (*People v. Tewksbury* (1976) 15 Cal.3d 953, 967.)

"To corroborate the testimony of an accomplice, the prosecution must present 'independent evidence,' that is, evidence that 'tends to connect the defendant with the crime charged' without aid or assistance from the accomplice's testimony. [Citation.] Corroborating evidence is sufficient if it tends to implicate the defendant and thus relates to some act or fact that is an element of the crime. [Citations.]" (*People v. Avila* (2006) 38 Cal.4th 491, 562–563 (*Avila*).)

Adequate corroboration of an accomplice's testimony need not in itself be sufficient to convict the defendant; it may be slight and entitled to little consideration when standing alone. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1128; *People v. Douglas* (1990) 50 Cal.3d 468, 507 (*Douglas*).) It need only " tend [ ] to connect the defendant with the crime so that the jury may be satisfied that the accomplice is telling the truth." (*Douglas*, *supra*, at p. 506, fn. omitted.) The corroborating evidence may be circumstantial and may consist of a defendant's conduct or
statements. (*Id.* at p. 507.) It thus may be evidence that shows a consciousness of guilt. (*People v. Hurd* (1970) 5 Cal.App.3d 865, 875.)

The corroborating evidence must tend to connect the defendant to the crime, but it has to neither establish every element of the offense nor corroborate all of the accomplice's testimony. (*People v. Heishman* (1988) 45 Cal.3d 147, 164–165.)

Although the corroborating evidence need only tend to connect the defendant to the crime, it must do more than raise a mere conjecture or suspicion of guilt. (*People v. Szeto* (1981) 29 Cal.3d 20, 27.) "[I]t is not sufficient to merely connect a defendant with the accomplice or other persons participating in the crime. The evidence must connect the defendant with the crime, not simply with its perpetrators. [Citations.]" (*People v. Falconer* (1988) 201 Cal.App.3d 1540, 1543 (*Falconer*).)

"'A defendant's own conduct, declarations and testimony may furnish adequate corroboration for the testimony of an accomplice.'" (*People v. Williams* (1997) 16 Cal.4th 635, 680; accord, *Avila*, *supra*, 38 Cal.4th at p. 563 ["Defendant's initial attempt to conceal from the police his involvement in the activities culminating in the murders implied consciousness of guilt constituting corroborative evidence"].) False and contradictory statements of a defendant regarding the charge are material corroborating evidence. (*People v. Santo* (1954) 43 Cal.2d 319, 330; *People v. Taylor* (1924) 70 Cal.App. 239, 244; *People v. McLean* (1890) 84 Cal. 480, 481 [accomplice testimony sufficiently corroborated by evidence the defendant "made contradictory statements concerning his whereabouts on the night of the fire" and "took measures to get the accomplice to leave that part of the country"].)

"'The trier of fact's determination on the issue of corroboration is binding on the reviewing court unless the corroborating evidence should not have been admitted or does not reasonably tend to connect the defendant with the commission of the crime.'[Citations.]" (*People v. Abilez* (2007) 41 Cal.4th 472, 505; *People v. McDermott* (2002) 28 Cal.4th 946, 986; *People v. Narvaez* (2002) 104 Cal.App.4th 1295, 1303.)

*B. Analysis*

Jackson was an accomplice as a matter of law, and the jury was so instructed. The jury was also instructed on the type of evidence needed to corroborate his testimony. We conclude there was independent evidence that tended to connect both appellants to the murder (count 1), and to connect Perkins to the firearm possession (count 2), to the degree that the jury reasonably could be satisfied that Jackson was testifying truthfully. (*Douglas*, *supra*, 50 Cal.3d at p. 506.)

Hendrix's testimony established that on the evening of the shooting (February 13, 2007), Perkins asked to borrow her red Ford Escort. After she gave Perkins the keys to the car, he left her apartment together with Jones and Jackson. The three men later returned to together around 9:42 p.m., close to the time Perkins had reportedly promised to return the car. According to Hendrix, all three men came into her apartment; appellants stayed in the living room while Jackson went back into the bathroom in her bedroom. The next morning, Hendrix found a firearm, along with a ski mask, under the couch in her living room. She had never seen any kind of gun before in her apartment. Hendrix arranged to return the gun to Jackson, who told her Perkins had left the gun there. In addition to this testimony, Hendrix told police that, as he was leaving her apartment after the shooting, Perkins asked Hendrix to return his gun to his uncle.

Hendrix further testified that "Glock .40" was printed on the gun she found under the living room couch. From the ballistics evidence, we know the main firearm involved in the shooting was a .40–caliber Glock semiautomatic pistol, and that all eight of the cartridge casings found at the scene were fired from the same weapon. Perkins suggests Hendrix's testimony about finding a gun under the couch was insufficient corroborating evidence because Jackson could have placed it there himself because, according to Hendrix's testimony, all three men came into her apartment when Perkins returned the keys to her car. However, even if the corroborating circumstances are consistent with the innocence of the accused, the determination as to whether the corroborating evidence is as compatible with innocence as it is with guilt is a question of weight for the trier of fact. (*People v. Gallardo* (1953) 41 Cal.2d 57, 63; *People v. Ruscoe* (1976) 54 Cal.App.3d 1005, 1012.)

Further corroboration was provided by the following:

Leann Newman and Travon Stewart both observed a red car in the vicinity of where McGruder was walking and the residential street where the shooting occurred. Stewart positively identified the car he observed as Hendrix's red Ford Escort, the keys to which, as discussed above, Perkins obtained from Hendrix before leaving her apartment together with Jones and Jackson.

Paul Evans' testimony and police report, when viewed in the light most favorable to the judgment, placed Jones in the same neighborhood where the shooting occurred near the time of the shooting.

Moreover, the jury heard appellants' police interviews, in which they both lied about their whereabouts on the night of the shooting and claimed not to know Hendrix, a claim refuted by other evidence including phone records and Hendrix's testimony.

Considered together, the forgoing circumstances provided ample corroboration for Jackson's accomplice testimony under the legal authorities set forth above. [fn 6]

[fn 6] We note that, above, we have found sufficient corroborating

1     evidence existed as to both appellants, without reference to the
2     evidence Perkins engaged in an attempt to dissuade Hendrix from
      testifying and tried to contact the Lelfore sisters and get Tasha
3     Lelfore to testify that she picked him up from outside Hendrix's
      apartment complex on a different night than the night of the
4     shooting. This evidence, which reflected Perkins's consciousness
      of guilt, constitutes additional corroboration for Jackson's
5     testimony and helps support Perkins's convictions.

6     Perkins also asks us to compare the matter before us to cases in which convictions
      were reversed for lack of accomplice corroboration. (See *People v. Robinson*
7     (1964) 61 Cal.2d 373, 398–399 [corroboration insufficient as to first degree
      murder where fingerprints on vehicle involved in crime showed defendant had
8     been around vehicle on some recent date and defendant's stories to police
      conflicted on a minor point]; *Falconer*, *supra*, 201 Cal.App.3d at pp. 1542–1543
9     [corroboration insufficient as to attempted robbery of marijuana plants, where
      defendant was father of one of the perpetrators, visited the residence eight to nine
10    months earlier, and knew the victim grew marijuana]; *People v. Martinez* (1982)
      132 Cal.App.3d 119, 124, 133 [corroboration insufficient as to robbery where
11    witness testifying defendant's complexion "exactly like" that of robber, where
      witness also testified, contrary to accomplice, robber had a beard, and other
12    testimony from police officers related merely to " 'the commission of the offense
      or the circumstances thereof,' " and did not connect defendant to the crime].) We
13    have considered these cases and are not persuaded that any of them compels
      reversal of the judgment in this matter.

14   Perkins, 2012 WL 1774826, at *7-10.

15        Section 1111 of the California Penal Code provides that "a conviction cannot be had

16   upon the testimony of an accomplice unless it be corroborated by such other evidence as shall

17   tend to connect the defendant with the commission of the offense." Cal. Penal Code § 1111. The

18   Ninth Circuit has recognized that section 1111 is a state statutory rule not required by the

19   Constitution or federal law, "and because section 1111 is a state rule, habeas will lie for

20   [Petitioner] only if the alleged violation of section 1111 denied [Petitioner] his due process right

21   to fundamental fairness." Laboa v. Calderon, 224 F.3d 972, 979 (9th Cir. 2000) (citing Estelle,

22   502 U.S. at 72-73). "A State violates a criminal defendant's due process right to fundamental

23   fairness if it arbitrarily deprives the defendant of a state law entitlement." Id. (citing Hicks v.

24   Oklahoma, 447 U.S. 343, 346 (1980)).

25        Here, the state court considered Petitioner's section 1111 claim and found that sufficient

26   corroboration of the accomplice testimony existed as to Petitioner *without* reference to evidence

27   relating to codefendant Perkins's guilt that was limited exclusively to Perkins. See Perkins, 2012

28   WL 1774826, at *9 n.6. The Ninth Circuit has found that such a procedure does not arbitrarily

deprive a petitioner of a state law entitlement under California Penal Code section 1111 in violation of his Fourteenth Amendment due process rights. See Jones v. Arnold, 593 F. App'x 674, 675 (9th Cir. 2015). Thus, there was a "reasonable basis for the state court to deny relief," and the California Court of Appeal's rejection of Petitioner's due process claim is not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 98, 103. As fairminded jurists could disagree whether the state court's denial conflicts with the Supreme Court's precedent, the decision was not contrary to, or an unreasonable application of, existing federal law as determined by the Supreme Court, and the Court must defer to the state court's decision. Accordingly, Petitioner is not entitled to habeas relief on his fifth claim and it must be denied.

### 5. Sentencing Claim

In Petitioner's sixth and last claim, he argues that the trial court's imposition of a consecutive term of twenty-five years to life on the gang-firearm enhancement under section 12022.53(d) and (e)(1) of the California Penal Code violated his due process rights because he did not personally discharge a weapon and the enhancement was initially struck on evidentiary insufficiency grounds. (ECF No. 1 at 10).

After the resentencing, the California Court of Appeal denied Petitioner's sentencing claims on his second direct appeal as follows:

> Jones contends the trial court erred in imposing the consecutive 25 year-to-life gang-firearm enhancement for several reasons, none of which we find persuasive. Section 12022.53 provides, in relevant part:

> > "(d) Notwithstanding any other provision of law, any person who, in the commission of a felony specified in subdivision (a) [ (e.g., Section 187 (murder)) ] . . . , personally and intentionally discharges a firearm and proximately causes great bodily injury . . . or death, to any person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life.

> > "(e)(1) The enhancements provided in this section shall apply to any person who is a principal in the commission of an offense if both of the following are pled and proved:

> > "(A) The person violated subdivision (b) of Section 186.22.

> "(B) Any principal in the offense committed any act specified in subdivision (b), (c), or (d).
>
> "(2) An enhancement for participation in a criminal street gang pursuant to Chapter 11 (commencing with Section 186.20) of Title 7 of Part 1 shall not be imposed on a person in addition to an enhancement imposed pursuant to this subdivision, unless the person personally used or personally discharged a firearm in the commission of the offense. [¶] . . .[¶]
>
> "(h) Notwithstanding Section 1385 or any other provision of law, the court shall not strike an allegation under this section or a finding bringing a person within the provisions of this section."

In this case, it is important to note there were two separate section 12022.53 enhancements attached to the murder count. The first enhancement alleged that each defendant personally discharged a firearm within the meaning of section 12022.53, subdivision (d). The second enhancement alleged that each defendant was a principal in the murder and that at least one principal personally used a firearm within the meaning of section 12022.53, subdivisions (d) and (e)(1).

At the original sentencing hearing, the trial court struck the first enhancement as to both Jones and his codefendant Perkins, explaining:

> "[T]he Court finds that the verdict of the jury with regard to the findings under . . . Section 12022.53, Subdivision (d) with regard to the defendant personally discharging a firearm, that there is not substantial evidence to support that as to the Defendant Jones. And that by returning the verdict that the Defendant Jones personally discharged the firearm, that is inconsistent with their finding that Defendant Perkins discharged the firearm. [¶] . . . [¶] So based on the finding of inconsistent verdicts and based on the finding of insufficiency of evidence, I do find it's in the interest of justice to strike the enhancements in Count 1 as to both the defendants. *And those are the enhancements under . . . Section 12022.53 Subdivision (d) only.*" (Italics added.)

The trial court made clear, both in its ruling and in its discussion with the parties preceding the ruling, that its ruling left intact the separate gang-firearm enhancement alleged under section 12022.53, subdivisions (d) and (e)(1), which is at issue in the current appeal. Contrary to Jones's suggestion, this enhancement was sufficiently alleged and proved, and was not vitiated by the court's decision to strike the section 12022.53 subdivision (d) enhancements on the ground the jury's true findings constituted inconsistent verdicts. The record undisputedly discloses substantial evidence that Jones was a principal in the murder, he violated section 186.22, subdivision (b), and a coprincipal in the offense personally and intentionally discharged a firearm causing McGruder's death. Therefore, it was appropriate for the court to maintain the separate gang-firearm enhancement found true by the jury and we reject Jones's assertions to the contrary.

We also reject Jones's claim that the imposition of the gang-firearm enhancement constituted an impermissible dual use of his gang participation, which was also used to sentence him to 25 years to life for his conviction of murder with the gang special circumstance pursuant to section 190.5. *People v. Brookfield* (2009) 47

Cal.4th 583 (*Brookfield*), on which Jones relies, is inapposite. *Brookfield* involved an accomplice to a gang-related shooting who did not personally use or discharge a firearm during the commission of the offense. (*Brookfield*, *supra*, 47 Cal.4th at p. 590.) Tasked with interpreting the language of section 12022.53, subdivision (e)(2), the California Supreme Court confirmed that dual punishment under sections 186.22 and 12022.53 cannot be imposed in the absence of a finding that the defendant personally used and/or intentionally discharged a firearm within the meaning of subdivision (b), (c), or (d) of section 12022.53.

The full text of section 12022.53, subdivision (e)(2) is as follows: "An enhancement for participation in a criminal street gang pursuant to Chapter 11 (commencing with Section 186.20) of Title 7 of Part 1 shall not be imposed on a person in addition to an enhancement imposed pursuant to this subdivision, unless the person personally used or personally discharged a firearm in the commission of the offense." Jones's gang participation was established for purposes of section 186.22, subdivision (b) and thus triggered the application of section 12022.53, subdivision (e)(1). However, the trial court's sentence was based upon section 190.2, subdivision (a)(22), not section 186.22 or any other provision contained in "Chapter 11 of Title 7" of the Penal Code. (§ 12022.53, subd. (e)(2).) Section 190.2 falls within chapter 1 of title 8 of the code. As such, the limitation set forth in section 12022.53, subdivision (e)(2), which the court addressed in *Brookfield*, does not apply here. We decline Jones's invitation to extend *Brookfield*'s holding beyond its statutory context to find error in this case.

Jones also contends "the spirit of *Miller v. Alabama* (2012) 567 U.S. —— [132 S.Ct. 2455, 183 L. Ed.2d 407] (*Miller*) precludes sentencing a seventeen-year-old African American male defendant to a sentence of 50 years to life, which statistically is tantamount to a sentence of life without possibility of parole." This is so, Jones asserts, because "a recent study shows the current life expectancy of an African American male is 67.5" and he "would not first be eligible for parole until he was 67 years old."

In *Graham v. Florida* (2010) 560 U.S. 48 (*Graham*), the United States Supreme Court held: "The Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide. A State need not guarantee the offender eventual release, but it if it imposes a sentence of life it must provide [the defendant] with some realistic opportunity to obtain release before the end of that term." (*Id*. at p. 82.)

In *Miller*, *supra*, 132 S.Ct. 2455, the court subsequently added that the reasoning in *Graham* "implicates any life-without-parole sentence imposed on a juvenile," including a sentence imposed upon a juvenile convicted of murder. (*Id*. at pp. 2465–2466.) A state is not required to guarantee eventual freedom, but must provide meaningful opportunity to obtain release based upon the defendant's demonstrated maturity and rehabilitation. (*Id*. at pp. 2468–2469.)

In *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*), the California Supreme Court reviewed the 110 years-to-life sentence imposed on a juvenile convicted of three counts of attempted murder. *Caballero* held that *Graham* and *Miller* compelled the conclusion that a sentence of 110 years to life is the functional equivalent of a life without parole sentence and therefore unconstitutional. (*Caballero, supra*, 55 Cal.4th at p. 268.)

The sentence imposed here is not comparable to the 110–year sentence in *Caballero*, which far exceeded the defendant's life expectancy or the life

expectancy of any person in the United States. Given the realistic possibility of release during Jones's lifetime, the sentence is not unconstitutional under *Graham* and *Miller*. (See *People v. Gonzales* (2001) 87 Cal.App.4th 1, 17 [50 years-to-life sentence not cruel and unusual punishment for 14 year old convicted of aiding and abetting gang-related murder].)

Jones, 2014 WL 2207332, at *3-5 (footnote omitted).

### a. Due Process

Petitioner contends that that the trial court's imposition at resentencing of a consecutive term of twenty-five years to life on the gang-firearm enhancement violated his due process rights. (ECF No. 1 at 10). Respondent argues that Petitioner's due process claim with respect to his sentence is unexhausted and therefore barred. (ECF No. 12 at 50).

A petitioner in state custody who is proceeding with a petition for writ of habeas corpus generally must exhaust state judicial remedies. 28 U.S.C. § 2254(b)(1). The exhaustion doctrine is based on comity to the state court and gives the state court the initial opportunity to correct the state's alleged constitutional deprivations. Coleman v. Thompson, 501 U.S. 722, 731 (1991); Rose v. Lundy, 455 U.S. 509, 518 (1982). A petitioner can satisfy the exhaustion requirement by providing the highest state court with a full and fair opportunity to consider each claim before presenting it to the federal court. O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999); Duncan v. Henry, 513 U.S. 364, 365 (1995); Picard v. Connor, 404 U.S. 270, 276 (1971). To provide the highest state court the necessary opportunity, the petitioner must "fairly present" the claim with "reference to a specific federal constitutional guarantee, as well as a statement of the facts that entitle the petitioner to relief." Duncan, 513 U.S. at 365; Gray v. Netherland, 518 U.S. 152, 162-63 (1996). See also Davis v. Silva, 511 F.3d 1005, 1009 (9th Cir. 2008).

Petitioner did not raise a due process claim with respect to his sentence in his petition for review in the California Supreme Court. (LD 17). Accordingly, this claim is unexhausted. However, pursuant to 28 U.S.C. § 2254(b)(2) a court may deny an unexhausted claim on the merits "when it is perfectly clear that the applicant does not raise even a colorable federal claim." Cassett v. Stewart, 406 F.3d 614, 624 (9th Cir. 2005) (adopting standard set forth in Granberry v. Greer, 481 U.S. 129 (1987)).

Here, at resentencing, the trial court imposed a consecutive term of twenty-five years to

1  life for the gang-firearm enhancement pursuant to section 12022.53(d) and (e)(1). (CT2[9] at 92;

2  RT2[10] at 17). As stated by the California Court of Appeal:

3          In this case, it is important to note there were two separate section
           12022.53 enhancements attached to the murder count. The first
4          enhancement alleged that each defendant personally discharged a
           firearm within the meaning of section 12022.53, subdivision (d).
5          The second enhancement alleged that each defendant was a
           principal in the murder and that at least one principal personally
6          used a firearm within the meaning of section 12022.53,
           subdivisions (d) and (e)(1).

7

8  Jones, 2014 WL 2207332, at *3. At the original sentencing hearing, the trial court struck the first

9  enhancement under section 12022.53(d) because "with regard to the defendant personally

10 discharging a firearm . . . there is not substantial evidence to support that as to the Defendant

11 Jones. And that by returning the verdict that the Defendant Jones personally discharged the

12 firearm, that is inconsistent with their finding that Defendant Perkins discharged the firearm." Id.

13 The trial judge explicitly stated, "I do find it's in the interest of justice to strike the enhancements

14 in Count 1 as to both the defendants. *And those are the enhancements under Penal Code Section*

15 *12022.53 Subdivision (d) only.*" Id. Thus, the trial court left untouched the jury's true finding of

16 the gang-firearm enhancement under section 12022.53(d) and (e)(1). This conclusion is

17 supported by the trial court's tentative ruling:

18         [M]y tentative would be to find that there was not sufficient
           evidence to support findings as to both of the defendants, that each
19         of them personally discharged a firearm within the meaning of
           Penal Code Section 12022.53 Subdivision (d). My tentative would
20         be to strike those findings as to each of the defendants.

21         That would still leave the Penal Code Section 12022.53
           Subdivision (d) with the Subdivision (e)(1) finding, and that
22         finding does not require the defendant to personally have
           discharged a firearm.

23

24 (21 RT 4297-98). Further, the court also inquired whether "if there was a reversal on retrial that

25 those enhancements could no longer be maintained . . . . You would still have the 12022.53

26 _____

27 [9] "CT2" refers to the Clerk's Transcript on Appeal in Case No. F066161, which Respondent lodged as Item 10.
   (ECF No. 15).
   [10] "RT2" refers to the Reporter's Transcript of Testimony and Proceedings in Case No. F066161, which Respondent
28 lodged as Item 12. (ECF No. 15).

1  Subdivision (d) and Subdivision (e)(1) enhancement that could be maintained." (21 RT 4334-
2  35).

3      Based on the foregoing, the trial court did not strike the gang-firearm enhancement under
4  section 12022.53(d) and (e)(1), which does not require a defendant to personally have discharged
5  a firearm. The trial court at resentencing relied on the jury's true finding of the gang-firearm
6  enhancement under section 12022.53(d) and (e)(1) and there was no violation of due process.
7  See Taylor v. Beard, --- F.3d ----, 2016 WL 278849, at *7 (9th Cir. Jan. 21, 2016) ("The
8  sentencing judge did not find facts that 'expose[d] the defendant to a greater punishment than
9  that authorized by the jury's guilty verdict.' We see no constitutional unfairness in the sentencing
10  judge's reliance on a conviction that had been fully and fairly litigated before a jury." (quoting
11  Apprendi v. New Jersey, 530 U.S. 466, 494 (2000))). As it is clear that Petitioner does not raise a
12  colorable federal due process claim with respect to his sentence, the Court may deny Petitioner's
13  unexhausted claim on the merits under 28 U.S.C. § 2254(b)(2).

14          **b.  Cruel and Unusual Punishment**

15      The Court "must construe pro se habeas filings liberally." Allen v. Calderon, 408 F.3d
16  1150, 1153 (9th Cir. 2005) (citing Maleng v. Cook, 490 U.S. 488 (1989)). To the extent that
17  Petitioner raises an Eighth Amendment claim with respect to his sentence in the instant petition,
18  the Court will review the California Court of Appeal's reasoned denial of the claim under the
19  AEDPA's deferential standard. Unlike Petitioner's due process claim, the Eighth Amendment
20  claim was fairly presented to the California Supreme Court in his petition for review and is thus
21  exhausted. (LD 17). The California Supreme Court summarily denied without prejudice
22  Petitioner's petition for review. (LD 18). The Court reviews the last reasoned state court opinion.
23  Ylst, 501 U.S. at 806.

24      The Supreme Court's Eighth Amendment jurisprudence addressing the proportionality of
25  sentences falls within two general classifications. The first classification involves a case-by-case
26  inquiry where the Court considers "all of the circumstances of the case to determine whether the
27  sentence is unconstitutionally excessive." Graham v. Florida, 560 U.S. 48, 59 (2010). The Eighth
28  Amendment "does not require strict proportionality between crime and sentence but rather

1   forbids only extreme sentences that are grossly disproportionate to the crime." <u>Id.</u> at 60 (internal

2   quotation marks omitted) (quoting <u>Harmelin v. Michigan</u>, 501 U.S. 957, 1001 (1991) (Kennedy,

3   J., concurring in part and concurring in judgment)). The second classification involves use of

4   "categorical rules to define Eighth Amendment standards." <u>Graham</u>, 560 U.S. at 60. Under the

5   categorical approach, the Supreme Court has held that "mandatory life without parole for those

6   under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on

7   'cruel and unusual punishments.'" <u>Miller v. Alabama</u>, 132 S. Ct. 2455, 2460 (2012).

8       Here, the California Court of Appeal's decision was not contrary to <u>Miller</u>, which held

9   that sentences of *mandatory* life *without parole* for juvenile offenders violated the Eighth

10  Amendment. Nor was the state court's decision an unreasonable application of <u>Miller</u> as

11  fairminded jurists could disagree whether a sentence of fifty years to life with the possibility of

12  parole for a juvenile convicted of first-degree murder conflicts with the Supreme Court's

13  precedent. Accordingly, the Court must defer to the state court's decision and Petitioner's Eighth

14  Amendment claim must be denied.

15      6.  <u>Petitioner's Request for Respondent to Furnish Trial Transcripts</u>

16      In his traverse, Petitioner claims that Respondent did not provide the Court with the trial

17  transcripts with his answer and Petitioner requests that Respondent provide the Court with the

18  trial transcripts. (ECF No. 18 at 2). However, Respondent lodged the transcripts with the Court

19  on April 15, 2015. (ECF No. 15).

20                                        **IV.**

21                               **RECOMMENDATION**

22      Accordingly, the Court HEREBY RECOMMENDS that the petition for writ of habeas

23  corpus be DENIED.

24      This Findings and Recommendation is submitted to the assigned United States District

25  Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local

26  Rules of Practice for the United States District Court, Eastern District of California. Within

27  **THIRTY (30) days** after service of the Findings and Recommendation, any party may file

28  written objections with the court and serve a copy on all parties. Such a document should be

captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The assigned District Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **February 26, 2016**

UNITED STATES MAGISTRATE JUDGE